Good morning. The first case this morning is 091064, University of South Carolina, University of Southern California. Mr. Jones. Thank you. May I please report? I want to address three sets of reversible error that we believe the TTAV committed in this case. The first set of reversible error relates to the TTAV's determination of the likelihood of confusion testing. And in particular, we believe that a legal error was committed in the way that the TTAV balanced the DuPont factors, particularly with its failure to credit the lack of actual confusion evidence. And the factual issue that we believe is not supported by substantial evidence relates to the new categories of purchasers that were created by the TTAV, namely what I call the Fairweather fans and the gift-giving relatives. And I'll get to those in just a minute. But with respect to the likelihood of confusion, your honors, Southern California has completely changed 180 degrees its argument now on appeal because of the way the TTAV ruled in this case. And what I mean by that is at the TTAV, and this is a quote from their brief, from their opening brief at the TTAV, Southern Cal said the products here are typically found together in certain locations. Well, that was their argument before the TTAV. And the TTAV has an insufficient opportunity for there to be any actual confusion. And that's the reason why there's been no actual confusion for the last eight years. And in fact, for off and on periods of time, for the last hundred years, this record is devoid of a single instance of actual confusion. And what the TTAV said and what Southern Cal now argues is the reason for that is these products aren't sold together. There's been no opportunity for there to be any actual confusion. But here's what the evidence actually shows. And this came from Southern Cal's own investigative report. The investigator found that the products have been sold around the country through a variety of stores, found that the products sometimes were sold by exactly the same retailers, and in conclusion found numerous stores that actually carried the goods from both Southern Cal and South Carolina. Your Honors, there was ample opportunity here for there to be actual confusion. The fact of the matter, there was none. And why? I came back recently from overseas, and I was shocked to see that the USC that I thought was USC, no actual confusion? I go to the sporting goods store which has all the hats from all the universities there, and I want to buy a USC hat, purposefully a little ambiguous at this moment. How do I know I'm not confused? Because, Your Honor, you walk into that store knowing the difference between the University of Southern California and the University of South Carolina. Yeah, by the way, why are you wearing Trojan colors on your tie? I thought I would give deference to them today. Better be careful. Actually, maybe that's Carolina colors. Yeah, it's close. The difference between the colors is not the grade. Well, there are actually two things in your question, Your Honor. The first one is USC, and interestingly, that's a point that I wanted to make. With respect to the name USC or the initials USC, there's an agreement between the University of Southern California and the University of South Carolina that recognizes that for 50 years prior to 1981, there was not a single act of confusion, single bit of evidence of actual confusion regarding the USC marks. And why is that the case? The case is, and this comes to the first part of your question. Because I'm going to be careful, and I'm going to know the difference between Carolina red and California red. Yes. Or burgundy, whatever the slight difference is. Yes. That's exactly why the conditions of purchase, Your Honor, when you're dealing with a secondary source identifying mark, such as these here. But we have legally identical marks, and that is probably the largest touchstone of confusion, isn't it? Your Honor, in a case of primary source indication, I would absolutely agree. The difference in this case is this purchaser into the decision already knowing what he or she is looking for. They come into the store knowing that they want to buy a trademark piece of clothing or product that associates themselves with their particular college team. But we also see instances of sporting goods, pink New York Yankee hats, where they don't follow the color scheme. And in that instance, your stylized SC is legally identical to their stylized SC. It would actually, in that instance, be impossible to know whether I got SC Carolina or California, wouldn't it? Your Honor, we don't believe so. Let's take your New York Yankees example. Pink. A pink SC hat. So I don't have the colors to identify. Which have I got? Have I got a Carolina or a California? But you know, because you walk into the store knowing that the South Carolina baseball team has a fishtail logo that is different. It may be legally identical, but it is sufficiently different from Southern Cal's interlocking athletic logo and sufficiently different from their baseball logo. You go into the store with the preconceived notion that I want the University of South Carolina, we call it a fishtail logo because it's got the little barbs on the end of it. But you go into the store knowing that you want to purchase a fishtail design. And you know that that's the University of South Carolina. Look around, particularly in the state of South Carolina, that logo probably appears on more clothing, more products than maybe any other of the South Carolina logos. And so you know that going in. The conditions of purchase when you go in to purchase a secondary identifier trademarked piece of clothing, leads you to the South Carolina mark. And your honor, you only have to look at the TTAB's findings to realize that they're inconsistent. What they ultimately found was there's no, the reason why there's no actual confusion evidence is because there was insufficient... But a standard character, remember we're dealing with a standard character mark here in one instance. The standard character mark doesn't have a logo and doesn't need that and could have fishtails. You're right, your honor. But let's take the standard character mark. The problem with the standard character mark is there is a limitation in each of the classes. In three of the classes, the term University Authorized is used. In the last class, class 25, the clothing class, the term University Controlled is used. Now those terms mean exactly the same thing. That's what Southern Cal told the trademark office when they were prosecuting their trademark. Here's what they said. Here's what Southern Cal told the trademark examiner. They called the limitation, and this is when they inserted the term University Authorized, they said that that was a limitation, a limitation. Now the TTAB said University Authorized is not a limitation. We don't know what it means. But there's a big difference between University Controlled and Authorized. I authorize everybody in the audience to sell my hats. I only control those that I sell at my own store. Your honor, we don't believe that's the case because again, here's what Southern Cal told the trademark office. They said, Southern Cal's trademark clothing is offered and sold through University Authorized channels of trade to SC's prospective and current students, alumni, fans of its athletic teams, visitors to its campus, and this is key, others desiring the cachet of its authentic collegiate style clothing. What that means is they're selling to people who recognize the secondary source represented by that logo, by SC. And if you read University Authorized to be different than University Controlled, then University Authorized has no meaning. It's meaningless. Every trademark. None of them have any meaning. None of them have. You're right, your honor. I mean, that's your argument really is that none of them have any meaning because they all just mean it's my trademark. Yes, your honor. That's exactly right. If University Authorized does not limit their classes to University Controlled, then you're right that none of them have any meaning. But it could go the other way, that University Authorized has no meaning and is just the same as having a trademark, whereas University Controlled does have a meaning and is different from the other two. That's another way of slicing it. Yes, your honor. You're exactly right. But if that had been the case, then Southern Cal would have never gotten their standard character registration allowed because the Snape Creek Manufacturing SC would have prevented it. That's how they got it allowed. So the board must have thought it meant something at that time. The board must have. You're exactly right. The board must have. But what does it mean? What does University Authorized mean if it doesn't mean University Controlled? And again, every trademark owner has the right to authorize use of its trademark. Otherwise, it's not a trademark. It would be an infringement. But aren't you overlooking that the rejection from the PTO was only as to one class, the clothing class? Everything else was allowed. But then why did they add the University Authorized limitation to the other classes? That was not in the other three classes. It's just like, call it a prosecution history as it applies to trademarks. It's the same standard. They added University Authorized to the other classes. We don't know why, but they did. And then they argued about it. They said the reason why is because this is a secondary source identifier. That's why it was authorized. And then, your honor, the board even contradicted itself in ruling against the University of South Carolina on our standing claim. The board said the restrictions, including the University Authorized, meant something and limited the trademark. And that's why there was no likelihood of confusion. But then, when the board got outside of the context of our counterclaim that they granted on summary judgment, then the decision regarding the opposition, they said exactly the opposite. They said, oh no, those three classes are not limited. So, the TTAB really shouldn't be able to have their cake and eat it too. They either have to say it is a limitation or it's not a limitation. And we believe it is, in fact, a limitation. Let me jump. Let me ask you something else. If the board is wrong on the likelihood of care that would be applied by the consumers, do you win? Is that enough for you? Yes, your honor. We do win because that's a legal question. The legal question of likelihood of confusion that this court can decide is that the TTAB failed to balance the DuPont factors. The DuPont factor, which the board simply avoided, was the credence given to the lack of actual confusion. And that's a factor that this court can consider on the legal question of likelihood of confusion. But there are so many other factors, including legal identicality. You're exactly right, your honor. But the number of factors is irrelevant. And I'm sure that Mr. Edelman is going to show you a chart that shows X number of factors were decided in Southern Cal's favor. That's not the test. The test is based on the totality of the circumstances, all the factors, which ones were. And here, with the lack of actual confusion, the lack of actual confusion evidence, that factor ought to take the day and ought to outweigh all of the other factors. Thank you, your honor. All right, thank you. Before we hear from Mr. Edelman, I was remiss in not recognizing our distinguished visitor this morning, Judge Claudia Wilkins, from the Northern District of California, sitting by designation of the Chief Justice. Give us a hand. We welcome her and we're glad to have her here with us. Thank you. And I'm sorry I overlooked the introduction. Mr. Edelman. Thank you. Good morning, your honors. It is my pleasure to represent the University of Southern California in this appeal. I have a couple of demonstratives that I was hoping to hand out. Those are close to South Carolina colors. We should have gotten our act together this morning. You guys are confusing me here. There's no likelihood of confusing you, your honor. I'll address that in a moment. With the court's permission, I have two charts which I provided a few weeks ago to Mr. Jones, and he has no objection. And I'd like to hand them up to the clerk or hand them to the clerk to hand to you to illustrate my arguments. Is that acceptable? Go ahead. Thank you. I wonder if you could address, though, the three prongs of the any old trademark is one, an authorized channel, and a controlled channel. What is the difference between those three? All right. Let me start with that. If you don't mind. I don't mind at all, your honor. Look, we don't know what the lawyer for USC was thinking at the time when he or she proposed authorized channels as opposed to university controlled stores. Or as opposed to nothing at all. As opposed to nothing at all. All we know is the following. There was a company selling socks called Snake Creek, which had a registration in class 25. The examiner thought that was a problem. It was only in class 25 that the examiner raised the issue. The lawyer for USC responded by proposing a limitation in all four classes, university authorized channels of trade. The examiner obviously thought that was meaningless because it was rejected. And instead the examiner said no, for class 25, which is the classified issue, it's going to be university controlled. So that meant for that class, things like the USC bookstore or other mechanisms where the university was controlling the sale. So university authorized means nothing. Well, you know, honestly, it doesn't mean a lot to me. And I think it probably didn't mean a lot to the examiner. It was just a plethora that the university put in there in an attempt to prevail. It was an attempt to come up with a distinction. And look, I mean, getting to some of the other issues in the case, you probably would not find as a university authorized channel of trade something being sold by South Carolina in a government building where they might be selling something else. But I don't think it's a huge meaningful distinction, but I do think that it's actually correct that the only limitation is in class 25. And if you read that limitation to mean the same thing as classes 6, 18, and 24, then the class 25 distinction doesn't mean anything. Mr. Edelman, these universities, these marks have been in use for decades, if not more, and there's no record of actual confusion here. What's the problem? First, Your Honor, they have not – I want to comment on the record because the record does not actually reflect that fact. What you saw in the reply brief in particular were citations to the record below where photographs had been introduced during the trial by USC's investigators, photographs which had been taken in 2004, 2005, actually after the close of discovery in this case. What we know is that there are successive periods of abandonment and non-use of SC by the University of South Carolina. There is no record of volume of sales. All we know is that they started selling hats in 1997 and they started selling other apparel in 2004. They absolutely failed to meet their burden to show any evidence of volume. So we really don't know how many sales they made, and what we do know is that the sales that they did make were made almost exclusively in South Carolina and a little bit around the fringes, which doesn't address at all the potential or likelihood of confusion in the event of a national registration where they could be selling everywhere. So that's one thing. The other thing that's important to note about the record is that we know that the limited sales that South Carolina has made of hats starting in 1997 and apparel in 2004 were made with secondary identifiers. 99% of the hats and I think 80% of the clothing have secondary identifiers. That's relevant for purposes of understanding why there might not be confusion. It's not relevant for purposes of analyzing their attempted registration because their registration is without limitation. Also, by the way, there was a discussion about colors. It's without limitation as to colors. So the registration has to be understood broadly. Finally, Your Honor, I would point out that we need to think about the food chain here in terms of when goods are cheap like this, and it's been acknowledged in several cases, including the smack apparel case from the Fifth Circuit in 2008, which was a case involving collegiate apparel, and USC was one of the parties, that when these goods are cheap, they're impulse purchases, confusion is not likely to ever be reported. How would Ken Corbett, who is the Director of Licensing at South Carolina and on whose testimony appellant relies, how would he know about instances of confusion in a $5 sale hat where Corbett or South Carolina licenses to Collegiate Licensing Corporation, by the way, and all the marks that they license where they have the lists year after year, they never list SC as one of the marks they're licensing, but Carolina licenses to CLC, which in turn licenses to a manufacturer like New Era, which in turn licenses to a retailer like Wal-Mart or Kohl's or Ben Baffin, one of these big national chains. Do you really think that if somebody realized at some point they bought the wrong hat, that complaint would ever make its way to Mr. Corbett such that he would know and be able to testify about instances of confusion? It's just not likely to happen in cases with goods of this nature. So I don't think, given the failure to meet the burden of proof with respect to evidence of sales and the other factors I've referenced, plus the fact that there are so many cases that say evidence of actual confusion is hard to come by and therefore not a critical factor, particularly in a case like this. I just think that issue is really a non-issue. And it ties into the point I wanted to make with one of my charts, which is the second one. It's the all factors, the DuPont factors. Your Honors, this case, or at least the appeal of the opposition, rises and falls on the standard of review because there is no possible way that one can credibly assert that the decisions, the factual determinations made by the TTAB were not made on the basis of substantial evidence. Can we examine one of the TTAB justifications? They talk about the gift-giving relative. Yes. Why doesn't that cut the other way? If I were a gift-giving relative and I wasn't sure, wouldn't I be extra careful to make sure I didn't buy my Carolina child a California hat? Your Honor, I don't think so. I think you wouldn't even stop to think about it. You're in Walmart. You're making 19 other purchases that have got nothing to do with this. You come across these hats. You have a granddaughter or a daughter. At one of these institutions, you're going to pick up a hat. No, in a word. It's a cheap product. You're moving quickly. You're going to look at it and you're going to go, oh, that would be a great gift. The whole point of this, you're not buying the hat, you're buying the mark in this case, and you can't get the wrong one. That would be embarrassing to my granddaughter. But you don't know that you're buying the wrong one. You're not even thinking in those terms. The notion that there's no foundation, and there's so much foundation in the record, not just in Mr. Stimler's testimony, but even Carolina's witnesses that... But I come back to the point here. People aren't buying the goods, as is usually the case with the trademark. Here, they're buying the mark. That's what I want. I want to have my cougars or my wildcats or whatever it is, those are... That is the purpose is to buy the mark. That begs the question. But it shows that I'm going to pay very close attention to the mark, not just the cheap hat. No, what it shows is that you are going to want to buy that hat because you think the hat is the institution that you are seeking to purchase the secondary source of. But you're not going to then stop and think for this $5 or $10 purchase. I mean, that's the whole problem. There was no foundation for this speculation that the board made on this gift-giving relative issue. Your Honor, I don't think that's correct, with all due respect. What was it? The foundation was Dan Stimler, who had been at the time of his testimony the director of licensing at USC for 15 years. He runs the whole enterprise, which is a significant enterprise at this point in time. And he is in charge of USC's catalogs. He's in charge of USC's sales. He talked about the fact that there's probably a 20% diehard fan group and that the rest of the people who are going to purchase, particularly in years of athletic success, are going to be people who know less about the specifics of the marks. Mr. Edelman, am I correct that with respect to the mark USC, as opposed to this mark, that California and Carolina have an agreement that divides it geographically? That is correct. Why doesn't that happen here? Well, because, principally, the reason it hasn't happened historically is because there was not a history of South Carolina using SC as there was of the two universities each using USC. So, acting responsibly, they sat down and they said, all right, we're going to make an agreement to divide the use of the mark geographically. That's an entirely different situation than what we have here. Carolina is the game tops. Carolina is Carolina. It's a capital C. The University of Southern California has been, for years and years and years, SC with respect to its athletic program. The pictures that I put in front of you, the middle one, the red hat, is Carolina's, these are all of course from the record, is Carolina's baseball fishtail logo that they're seeking registration on. Everything around it represents historical uses by the University of Southern California throughout the 20th century of SC. And so you'll see, for example, just above the hat that at times, the University of Southern California has used the exact same, what they call the fish style mark, but the interlock. And you'll see other representations of SC on the other articles of clothing. You'll see a runner just beneath the hat to the right with something that's very similar to what's in this cap. My point there, Your Honor, is that University of Southern California has used SC for over 100 years. This is a new effort by the University of South Carolina and that's why my client has objected in the fashion it has to the registration. Getting back to the fair weather fan and the gift-giving relative, what if the board is wrong on that point? Do you lose or do you have an argument still? I have more than an argument, Your Honor. I have the fact that we're here and that is one factor getting, I think, to the point Judge Rader was making earlier. That is probably, that is, in a whole line of cases that we've discussed in our briefs, that factor is much less significant when you have a situation like we have here where you have either similar or identical goods being sold with similar or identical trademarks in the same channels of trade. Those three factors are, in our view, nearly dispositive of the case and that's why I presented this chart to just show you that USC, as University of Southern California, as the court is familiar, prevailed before the TTAB on three grounds. Three grounds. Three separate sets of rights. And when you look through all of the DuPont factors at issue, this chart was made with reference to South Carolina's proposed registration. So with respect to their proposed registration, the University of Southern California won on each of these grounds and the only ones that South Carolina is challenging are those which are in bold. They're challenging factual findings with respect to conditions of purchase, sophistication, and with respect to evidence of actual confusion, which I've attempted to address in my argument today, but I think the bottom line in this case, and the reason I said that this case rises and falls with the standard of review, is because what they're asking you to do is to reverse the findings of the TTAB, to find in South Carolina's favor. That cannot be done on the basis of this record. And I have 48 seconds left, which I'll yield to one of my colleagues behind me. Unless you have any further questions. Thank you. Thank you for your time. Thank you, Your Honors. You are the latecomer here, aren't you? I'm sorry? You are the latecomer here, aren't you? Yes, Your Honor. We adopted our Carolina baseball logo in 1997, and the latecomer with respect to all three of the applications. Now, we have an argument that we can tack back uses of SC a lot earlier, but we really don't address that issue here. Three very quick points. How do you overcome that? That's always a pretty important point for trademark law. Yes, Your Honor. But the way we overcome it is in direct answer to Judge Wilkins' question, which is if they lose the gift-giving and fair-weather fan issue, then there's a finding by the TTAB that all the other purchasers would not be confused, that they would be able to distinguish. What Stemler said is there are really three groups of people. There's fair-weather fans and gift-givers on the very end. In the middle, there are regular fans, students, and alumni. No, they wouldn't be actually confused. There's a difference in the law between actual confusion and likelihood. Your Honor. And there are many reasons here why there might not be actual confusion, such as it's usually displayed with the team colors, it's usually displayed with team logos, it's usually displayed in ways that militate against the confusion. When you have legally identical marks, don't we have to weigh that heavily in the different question of whether there's a likelihood of confusion? Not here, Your Honor, because what the TTAB found was that, quote, many, M-A-N-Y, close quote, purchasers would be able to distinguish these marks. That's the TTAB finding. And so if the gift-giving relatives and fair-weather fans go away, the finding by the TTAB is that everybody else would be able to distinguish the marks. And therefore, if they would be able to distinguish, there's no likelihood of confusion. And that's what the case rises and falls on. Thank you, Your Honor. Thank you. Thank you.  Thank you. The next case will be 09-1234-1235, New Corp. Corporation of the United States. Good morning. May it please the Court, I'm Daniel Pickard of Wiley-Rodham Court this morning on behalf of New Corp. The central issue on appeal here is whether a federal agency is free to disregard the legislative purpose of the statute that it's charged with governing. Specifically, the ITC is required to make an determination whether imports from various countries should be cumulated together in determining whether those imports are likely to result in material injury to the domestic industry. The legislative history, subsequent case law, and it appears all parties to this action, agree that the primary purpose of the cumulation statute is to determine whether the imports from the various countries will result in a hammering effect on the domestic industry. In sunset reviews, the Commission has discretion whether to cumulate those imports. Our position has consistently been that that discretion is not unfettered, that the Commission in exercising its discretion must do so consistent with the purpose of the statute. That is, an examination whether subject imports will have a hammering effect on the domestic industry. So the statute doesn't have an alternative purpose of considering the conditions of competition and weighing that in the balance? There is no mention of that in the statute whatsoever, Your Honor. Well, we're in the legislative history policy. The legislative history is clear that it is the hammering effects that is the principal purpose of cumulation, and that's been reinforced through several decisions of the ITC's review. But if we look at the statute, looking particularly at the cumulation part, it requires the Commission to make some judgment as to whether they're likely to compete with each other, right? Correct. Why isn't that the basis to sustain exactly what they've done? They have merely made the judgment that Korea and Germany compete, Japan, Canada, and the rest don't. The Commission is free to exercise its discretion and view additional factors which could be relevant to the conditions of competition, so long as it meets two requirements. One, that it's relevant to the underlying purpose of the statute, and two, that they explain, they provide a reasoned discussion why these factors are relevant to the purpose of the governing statute. Because if it doesn't do so, really it turns the agency into a black box. If any difference in the conditions of competition are sufficient to satisfy or defend a determination to decumulate or cumulate, the agency really becomes a black box. It was a pretty long opinion to criticize for a lack of explanation. The accumulation analysis, I would suggest, was somewhat abbreviated and that nowhere in the accumulation decision is there any reasoned discussion that goes to the central and primary purpose of the accumulation decision. What about the court below? There's a long opinion there as well. There was a long opinion in the court below and I believe that the court's opinion itself shows perhaps some misunderstandings of the arguments that were put forth before. At no point have we ever argued that there's a lack of discretion by the ITC. It's just not unfettered discretion. They cannot choose to cumulate for any reason or no reason whatsoever. The Supreme Court has been very clear that the exercise of discretion by federal agencies must be consistent with the language and the purpose of the statute. It's important because... But the Congress not only gave them authority to determine whether there's a likelihood of competition, they also said they may accumulate. They gave them ultimate discretion with the judgment of accumulation, didn't they? Why should we here on appeal question discretion that was given them by Congress? It's crucial for this court to question that because it's not unfettered discretion. If they can choose, if the ITC can decumulate for any reason whatsoever... What in the statute limits that discretion? I'm looking at 1675 here. What limits their discretion? It's not on the face of the statute itself, Your Honor. It's a long-standing precedent of the reviewing court. For example, there is nothing in the statute itself that specifically says that the ITC should not administer this statute corruptly. But clearly, that would be an unlawful exercise of its discretion. Similarly, if it did so in an arbitrary and capricious manner, that would be an unlawful exercise of its discretion. We maintain that the exercise of its discretion divorced from, devoid of the congressional purpose is also unlawful. All right. Let's hear from your colleague. Can I ask a question? It's the same side. Oh, I forgot. I don't know why. Me, by the way. OK. We'll answer your question, but I'll have to ask it of you. May it please the Court? I'm Stephen Bond, representing U.S. Steel. I can take your question, or I could... I was also going to respond to your question about the... Please respond to it. Judge, we'll... I was just curious from your brief, which addressed sort of policy and analysis and so on, but didn't actually get down to brass tacks as to what is really wrong with the result. Is the result contrary to policy? Is there something actually factually wrong with the result that was reached? Yeah, let me explain what... You didn't talk anything about percentage of tons or percentage of competition or volume or any of that. We think this presents a straightforward legal issue. We had some factual challenges below, but what we wanted to present to this Court is a straightforward legal question. And to give you a sense of what's wrong, let me explain what they're actually doing. What happens is this. Judge Rader had a question about, you know, there's language in the statute about how they have to find that there's competition. Here, they did, in fact, find that that statutory factor was met, that there's a reasonable overlap of competition. They also found that imports from every subject country would likely have a discernible adverse impact. So those two statutory factors, which are the two thresholds for accumulation, both of those were found. There's no objection up to that point. What is happening at that point is the black box. What they have done is they have taken the word may and they have expanded it to represent a practice whereby they can mix and match these countries for any reason. All they say in this opinion is that there are different conditions of competition. But they didn't give us a black box. They talked about how the situation in Australia, France, and Japan had been a steady decline and how Korea and Germany had continued to incline. They talked about the larger impact of the market of those two, the lesser impact on the market of the other two. I'm reading the record entirely differently, perhaps. No, no, no. That's a very good question. But let me just explain what's going on. This is a big record. They collect a lot of data on these countries. They can always find differences between country A and country B. They can always point to some factor that's going to distinguish one country from another country. The point is we don't know, going into it, what factors they're going to look at. We don't know what factors they're going to find relevant. We don't know what the standard is as to how they figure out which factors are relevant. The division between Australia, France, and Japan versus Korea, Germany, no one briefed that. No one asked for that. No one knew that at the time. But there's a pretty logical distinction. The three are going down at remarkable rates. The other two are coming up at remarkable rates. But they looked at these same countries in 2000. Why wouldn't you have briefed that, is my question? Why wouldn't you say there's a difference but not that big a difference or whatever argument you want to make? Because it's literally not possible to brief all the potential combinations of countries that they could have come up with. No one, just thinking about it... That's a pretty big distinction. Two going up, three going down. But there's a lot of other evidence and there's a lot of other distinctions in the record. For example, Japan, in the original investigations, they were a much bigger player in this market, say, than Australia. Or France and Germany are in Europe, whereas Japan and Korea are in Asia. The point of it is, they have interpreted this thing in such a way that we don't know what they're going to do beforehand. And once they do it, all that's left for the courts is to say, well, yeah, I guess these numbers are different from these numbers. I thought you filed post-hearing briefs. Well, no, ma'am, because, Your Honor, the way it works is that we file our pre-hearing brief, they have the hearing, then we file a post-hearing brief, then they decide. No one knew until they voted, no one had briefed, Australia, France, and Japan should be over here, Korea, Germany should be over here. Until we went to the vote, no one knew that was going to happen. No one can, though. They looked at these exact same countries in 2000 and found all the nations of competition were the same. Under your theory, if there were a group of companies like this, five countries, and four of them had made vast efforts to improve and had declined vastly, and one of them had shot up, you would hold the four responsible for the actions of the one country, right? Not necessarily. You would deprive at least the commission of the discretion to take that into consideration. With all respect, Your Honor, I don't think so. All we are saying... Well, then what are you saying? All we said is... You want them all together. No. What we said is that we need, from this court, we need a legal standard that we can brief to and that you all can review. We don't create legal standards. That's in the statute, and it says you may. But the statute read in, we think that it is a basic principle of statutory interpretation that they cannot exercise their discretion or interpret the statute in a manner that defeats the purpose of accumulation. If, in your example, they lay out for the court... But what if the accumulation is not hammering, is the point. Three of them are coming down. They're not hammering. The two may still be hammering, and so you keep those together. But that seems to be what the commission said, and why should we second-guess that? Okay. Because, first of all, they have to decide what's going to happen once the orders are revoked. If they come out and they say, we've looked at this, and we find that they will compete with each other, and we find that imports from every country will have a discernible adverse impact, but based on these factors, we don't think there's actually going to be a combined hammering effect. That's a decision that the courts can review. That's a decision that we can sort of brief, a standard that we can brief to, and that's consistent with the legislative purpose of accumulation. And right now, that's what we don't have. What happens is they come out and say, these countries are different from these countries, therefore we're not going to accumulate. What was your position? They should all be accumulated together, or nobody should be accumulated? The domestic industry generally took the position that the commission should accumulate all six countries just as it had done in 2000. The Japanese producers, for example, they said Japan should be decumulated. Other countries said that they should be decumulated. What no one did was to say, you should put Australia, France, and Japan together, and you should put Korea and Germany separately. What's your answer to their waiver argument? Well, I think that there's a couple of things. First of all, one point that was made at the hearing was, well, Canada might actually ship more than the other countries. And we said very clearly at the hearing, we said you can't decumulate somebody on the grounds that they're going to have more of a hammering effect. So we made it clear that the hammering effect, in our opinion, was something that the commission should consider. And the other thing, to be honest, Your Honor, there wasn't a way for us to know what they were going to do. Our objection is not to the exercise of discretion. It's not even really to the conditions of competition or looking at conditions of competition in order to exercise your discretion. Our objection is applying discretion in such a way that we can't know what's going to happen and we can't know what they're going to say. All right. Mr. Fishberg. Well, you divided yours in half as well. Ten for you, right? Five for you. Ten for me and five for my colleague, yes. Thank you. May it please the Court, good morning, Your Honors. My name is David Fishberg, and I am here today representing the International Trade Commission in this action. The issue before you today is whether the commission's consideration of likely conditions of competition as part of its accumulation analysis and sunset reviews is a permissible interpretation of the statute and in accordance with the law. The simple answer to that question is yes. Once you've decided that they're likely to compete, how do you get around the likelihood of hammering effects as well? In other words, if you were going to make this decision, shouldn't you have decided these three really don't compete the same way as Korea and Germany? Judge Rader, I would posit that that's exactly what we did find. We found that there was an overlap of competition, a certain baseline of competition between all the countries that got us past this likely to compete language in the statute, which is an exception to accumulation. But even if Congress made very clear that even if you were to find that, the commission, as you pointed out, still may accumulate. It doesn't require us to accumulate. And what appellants have done in this case is they've tried to transform language from present injury determinations, where Congress made very clear that if these two factors are met, you shall accumulate, and try to put that language into sunset reviews, which is a different analytical framework than present injury investigations, where Congress said you're doing a predictive prospective analysis where even if these two factors are met, you may accumulate. And Congress didn't tell us here are the factors that you need to look at to accumulate. Congress left it to the commission, and our reviewing course below has recognized that the commission therefore has wide latitude in terms of the factors it looks at for the commissioners to therefore exercise discretion in the end and determine whether or not it will accumulate countries. As Judge Wilkins said before, we have appellants from domestic interested parties coming to us all the time, and their position is always accumulate all the countries together. And we have respondent parties coming to us telling us don't accumulate any of the countries together. And it's the role of the commission to look at the record evidence. Imagine that, looking at the record evidence before it and saying these countries are competing in a certain manner, and therefore we're going to accumulate them together, and these other countries are competing in a certain manner, and therefore we're going to accumulate them together. But just because the party is arguing we should accumulate everyone together or not accumulate anyone together doesn't mean the commission is bound in any way to do what the parties are asking us to do. Mr. Pickard and Mr. Vaughan invite this court to set some standards on the discretion of accumulation. First of all, Your Honor, that's not in the statute. If Congress wanted the commission to look at any specific factors, it would have put it in the statute. But of course there is a standard that our reviewing courts use. It's an abuse of discretion standard. So when appellants come up here and tell you that, oh, the commission looks at any factors it wants to, that's not the case and wasn't the case in this specific case at hand. In fact, the commission looked at factors that it looked at in the past and these factors have been affirmed by the lower courts, factors such as differences in volume and price trends, differences in the level of corporate affiliation. So the commission is not just looking at any factors out there. It's looking at factors that will have a bearing on how these imports are likely volume and price trends for these imports to the market. And this is not a new or novel theory that the commission just came up with. In the very first Sunset Reviews back in 1999, a case, Sugar from the European et al., the commission laid out its analysis very clearly and said, in a prospective analysis, the commission is going to look at how these imports are going to compete. It's going to look at such things as differences in volume and price trends. And this has been very clear for appellants to come in and say, it's a black box, we have no idea what the commission is going to look at. They do have an idea. There's a very finite number of factors that the commission looks at. And in this case, the commission looked at factors that the parties argued to us. Appellants themselves set up their briefs in a manner where they addressed whether or not such imports were going to have a discernible adverse impact, whether or not they were likely to compete. And then they addressed conditions of competition. And they argued to us they're all going to have similar conditions of competition. And respondents came into the commission and argued, no, none of these countries are going to have similar conditions of competition. The commission did a very nuanced analysis in this case, and as Judge Wilken pointed out, a very long analysis. It's a long opinion. There's six pages alone on accumulation where the commission went through the reasons, went through the factors that were argued to us by the parties in detail, discussed those factors, and then came to a conclusion, as Judge Rader pointed out, that these three countries show an interest in the U.S. market, while these two countries, Germany and Korea, show an interest in the U.S. market, while these three countries, France, Japan, and Australia,  Is it unfair to a party to not know where or how the commission in advance, how the commission might accumulate or divide? I think every party would like to know that. I'd like to know that of this court. I don't think it's unfair. But to tell us what the standard is that the party, or to make an argument that there's a black box out there because they can't plug in a mouth of formula and know how the commission is going to come out is not the standard here. It's whether the commission's analysis was reasonable. And we relied on factors on the record. The appellants aren't even arguing that the facts we relied on are wrong. It'd be one thing if they were coming to this court and saying, the commission and our lower court, they said there were differences in volume trends, but there weren't. Actually, the volume trends were going the same way. Whether there was a commission relying on a difference in corporate affiliation. But that's not true. That's not what they're arguing here. So for them to, again, to come up with an argument that there's a black box, when, again, they themselves argued these very factors. They responded to the respondents at the administrative level. They responded to these arguments. So the commission had a record before it where these issues were addressed to it. So, again, I don't see how appellants can come in with that argument. Setting aside whether one needs to find this in the legislative history, do you find anything in the legislative history addressing a policy of considering conditions of competition as well as hammering? Well, I think that explicitly in the language of the accumulation provision in Sunset Reviews, CAJA explicitly gave us the ability not to accumulate even if the two statutory factors were met. And I think the commission, again, in its very first Sunset Reviews, came up with this conditions of competition analysis where it said, we're going to look at how these imports are actually competing because what we're doing is a predictive analysis here. In Sunset Reviews, we're looking at what's likely to happen. It's a counterfactual analysis because there's an order in place.  So what the commission said is, we're going to do a further analysis to assure ourselves that our accumulation decision is not just based on inherent speculation, that it's actually tied to the facts on the record and it's tied to substantial evidence that the parties are arguing. The how they affect language that appellants are pointing out is just one piece of legislative history that came out in pleasant injury determination. But is there something in that same legislative history that addresses other conditions of competition? Well, I think, actually, it's not the legislative history. It's actually the language of the statute which tells us to look at competition. And competition is a vital element of the statute. So we go and we look at competition, likely competition, how these imports are likely to compete in the future. So we don't need to rely on legislative history. We actually look at the language of accumulation provision itself. And I think there's a big issue that we have when appellants come up and say, the sole purpose of Congress is to address hammering effects. We do not think that that's the case. As we point out in threat determinations, which the commission had been doing since the late 1980s, it was also looking at volume and price trends. And a threat analysis is also a predictive analysis where we're trying to see what's going to happen in the imminent future. And in the threat analysis, the commission was doing the test in the late 1980s, had been doing the test for six years by the time Congress and the URAA statutorily said, we are preserving your discretion to conduct this analysis in the threat context. Had Congress in any way been concerned with us not accumulating countries based on volume and price trends, I don't think they would have told us we're preserving your discretion in this context. And then Congress went beyond that and said, we're crafting the sunset provision in 1994 to give you the same amount of discretion that you have in the threat context. So for them to come up here and say, the sole purpose of accumulation is to deal with hammering effects, when Congress actually gave us discretion in the sunset review context, you know, we just fundamentally disagree with that. All right, thank you. Thank you, Your Honor. Thank you, Wood. Thank you, Your Honor. Good morning, I'm Chris Wood of Harington Hall on behalf of the Japanese respondents. And obviously we concur completely with the ITC's interpretation of its governing statute. I'd like to just add one or two points on this argument raised by the appellants that the accumulation process is something of a black box where parties genuinely do not know how to frame their arguments. You know, as a practitioner, I think that's overstated. You can go back to the very first sunset review in which the commission addressed accumulation. And I think the commission laid out very clearly what its approach was going to be. They're not looking at random factual distinctions. They're looking at specific conditions of competition that bear on likely future volume trends and likely future price trends. And now that we have ten plus years of sunset review precedents out there, it's really quite reasonable to expect that you can look at what the commission has done in the past, frame your arguments in the light of the specific product and industry which you're representing, and argue from a respondent perspective that the conditions of competition affecting your particular industry are in fact quite different than those affecting any other country. What about the notion that one could accumulate in various different ways and nobody thought of or argued for the way they did accumulate? What were you arguing for and how did you decide what to do and what they might do? Well, sir, my role as counsel to the Japanese respondents is to attempt to get the commission to look at the Japanese respondents individually. I am most familiar with the conditions of competition that affect those producers. I can argue as to our trends. I can argue as to why we believe we are differentiated from other countries that are subject to the review. But in the final analysis, it's the commission that is looking at the entire record, and it is particularly within the expert judgment of that agency to draw whatever conclusions it believes are most reasonable on the facts. So you didn't posit certain groupings that you favored? No, that's frankly outside the scope of our role on that, but it's well within the commission's exercise of its own discretion. If I could take just a couple of minutes and turn to our exhaustion argument, because we really do think there is a fundamental problem with the very premise of this appeal, and that problem is that the appellants are asking this court to strike down a longstanding, consistent practice of the statute, consistent interpretation by the commission of its governing statute on grounds that were never presented to the ITC for decision. It implicates both of the core reasons that there is an exhaustion doctrine, both to protect the authority of administrative agencies to announce its own rules and explain its reason, and also to promote efficiency in judicial review. You mean waiver? You're referring to it as waiver or exhaustion? I'm referring to it as exhaustion in the sense that I do not believe that the appellants ever said to the commission that we believe your consideration of conditions of competition without an express tie to hammering effects violates your statutory mandate. I'll give a couple of sites where they say they said that, once at the hearing and twice in post-hearing brief. Well, that's right. Let me address both of those. I believe Mr. Narkin addressed the testimony at the hearing, which relates to a comment where, as counsel represented, the domestic industry argued that the Canadian imports would have a heavier impact due to their higher volumes and that they would have a greater hammering effect for that reason. But I don't think that's enough to put the commission on notice that their entire analytical model was being called into question. I mean, it was specific to Canada. Canada, the commission's determination with respect to Canada, is not even an issue on this appeal. That's not one of the countries that was appealed. With respect to the post-hearing brief sites, the Nucor brief simply cites in a footnote to that statement from the hearing but does not elevate it into a broader argument about the commission's overall statutory interpretation. And I will confess that when I reviewed the U.S. Steel post-hearing brief site, I could not see that that argument was raised at all. It was actually the part that they cited appears to be a response to a question asking about whether material injury would be likely to reoccur even if the commission chose not to accumulate in any of the countries. So we don't think that that's there. We think that essentially all of the conditions of competition that the commission found persuasive in this case were ones actually raised in the briefs by the parties. So that if at any point the appellants believed that consideration of those factors would somehow be ultra-variant of the commission's authority under the statute, they absolutely had a potential to raise those issues in the obligation so that the commission could in the first instance weigh in on this argument. Thank you very much. What you've heard from the other side is that we look at a lot of conditions of competition and that these conditions of competition can lead to differences. But what you have not heard from the other side is what those differences have to do with accumulation or the purpose of accumulation. Let's assume for the sake of the record that imports from Australia, France, and Japan are going to be lower in volume than imports from Korea and Germany. The whole point of accumulation is that small volumes of imports from different countries can add together and have a hammering effect and hurt domestic producers. The mere fact that some countries might ship fewer imports than other countries has nothing to do with accumulation. And this is the whole problem. What we are asking is that if they want to de-accumulate, if they want to exercise that discretion to de-accumulate, they have to explain what their decision has to do with the purpose of accumulation. If you look on page 26 of our brief, for example, we cite a brief that they filed at the CIT in which they acknowledge that the hammering effect is a purpose of accumulation but that they don't consider that as something that they necessarily have to address. That is the whole issue here. I'm sorry, where did you say that? It's on page 26 of our brief where we cite a brief that they filed at the Court of International Trade. That's the whole issue here. All we ask is that when they exercise this discretion to de-accumulate, once they've found there's going to be an overlap of competition and once they've found that all the imports from every country are going to have a discernible adverse impact, give us an explanation about why the reasons on which you rely are relevant to the purposes of accumulation. Thank you. The case is submitted. Thank you. Thank you. The next case will be 097068. Hawkins will be the Secretary of Veterans Affairs. Mr. Morton. Yes, Your Honor. My name is Myers Morton. I'm from Knoxville, Tennessee. Elmer Hawkins is a Vietnam veteran who was exposed repeatedly to Agent Orange. He has very nasty ailments. It's difficult for him, and I've described it in my brief. He has a very difficult time. He filed a claim to be compensated 19 years ago, 19 years. And the VA, since that 19 years, have been disrespectful, have played games, and have ignored his rights to have his claim heard, to have his opportunity to have a decision made on whether or not his problems are connected with his exposure to Agent Orange. And if the Court please, I respectfully suggest that the VA or the DVA is struggling to come to grips with the use of Agent Orange and what it does to these veterans. And they decide they're not going to grant him compensation. They're going to let him die, and he will die. It's a severe statement, but that's just the 19 years indicates to me, if the Court please, what has happened. And examples of things that the Court have done, I mean, I'm sorry, that the Veterans Administration, the Department of Veterans Affairs, have done is they have taken tissue samples and refused to return them after years. They have cited studies anonymously and not provided those studies to Mr. Hawkins and me to determine if those studies supported him. Is the claim that the studies are confidential, or they're just not cited? First, initially, they cite general studies. Without specifying what it is? That's correct, Your Honor. And so one of our first appeals, I've had four mandamus petitions with the Court of Appeals for Veterans Claims. And what happens is I file my mandamus petition, I complain about the problems, and the VA responds. After I file a petition. I was driving up from Knoxville yesterday trying to think of an analogy on what the DVA does. And I came to 1-1. When I'm driving up the interstate, everybody's going 70, 80, 90 miles an hour. They're going fast. When the state trooper pulls on, everybody goes 65. Everybody's calm. Everybody's going according to the law. When the state trooper pulls off, everybody's back up. That's what this 19-year history of the VA does. When the court is involved, when the court is watching, they do what they're supposed to do. They answer my four mandamus petitions. I've also had three appeals on this case, this very case. And so what's happened in this latest appeal, the latest mandamus, the court, my complaints with the DVA on this mandamus was the DVA was refusing to let us know a status. They're refusing to provide to us results of medical examination, of tissue samples that came from this veteran. They were ignoring my request. Because you want what their doctors said about your tissues. That's correct. And they would not, they will not do it. So I filed my fourth mandamus petition. They sent me a big box. Now, it's not the record what they sent me, so I can't tell you what's absent from that box. I mean, that just ain't the point being when I file a mandamus petition, they act. So when you want, one of your things that you're wanting us to do is tell them to disclose files. Now, by that, you mean what? The treatises, the results of examinations of the tissues, is that? Yes, Your Honor. Those other things? The court of appeals for veterans claims told them that a dozen years ago. Mr. Morton? Yes, Your Honor. If this court started intervening in the veterans' administration processes and telling them they have to act faster on this claim and give them more information on that claim, wouldn't we, in effect, be intervening inappropriately in their process? Wouldn't we get thousands of people coming here requesting, please give them a jolt in my case. No, my case is first. No, my case ought to be first. How do we, as a court, judge which one ought to be first and which one ought to have more priority or less? Your Honor, I don't think it would be inappropriate for this court to make the DVA faithfully execute what the laws are, which is pay these men. I'm sure they're making every effort to do so. I'm also sure that they make a lot of mistakes, like all human institutions. But I'm just trying to understand what standard you would give us for intervening in this case or that case, but not other cases, because that's really what you're asking us to do. You're asking us to step in and give them an order about how they do their job. This is the only case I'm familiar that's been pending for 19 years. I agree that there's a lot, although you don't, well, it'd be impossible to show any intentional delay. I can't, no, Your Honor, no way. There's been remands and efforts. I'm sure they can point to legitimate efforts to try and help you along the way. But, again, you've asked for something we almost never do, and that's tell an agency how to do their job. If the court does nothing, this veteran's going to die, and he's not going to get anything. That's what's going to happen. But we have many such cases. I understand, Your Honor, and I'm representing Mr. Hawkins, and he's terribly ill, and unless the Court of Appeals for Veterans' Claims is standing there with something pending, the VA will do nothing. Here's another example of what the DVA did. We have no man-damaged petitions. Well, the record doesn't show that they do nothing. It just shows that they're making an effort to find evidence, and it doesn't come up, so they remand, and there have been five remands, as I counted.